NEW YORK COUNTY.—HON. D. C. CALVIN, SURROGATE.— October, 1880.

SARVENT v. HESDRA.

*In the matter of the probate of the will of* CYNTHIA HESDRA, *deceased.*

The decedent lived with her husband for many years, without any evidence of alienation or discord, and died, leaving no parents or children. Several months after her decease, a paper alleged to have been discovered was propounded by her husband, as her will, whereby she left all her property to him. Evidence was adduced that this was in pursuance of an understanding had between them during her life-time. The probate was contested by various relatives of decedent who would have been entitled to share in her estate in case of intestacy, and who attempted to prove that the signature of the testatrix, and of a deceased subscribing witness, were forgeries. The draughtsman, who was the surviving subscribing witness, did not at first recollect drawing and witnessing the will, but recalled the facts, from the statements to him of another who was present at the time, and from a memorandum in

his diary.   A great number of witnesses was examined upon each side, including two experts in handwriting, who testified against the genuineness of the contested signatures, but arrived at their conclusions by inconsistent theories.   *Held,* 1. That the delay in producing the will was not necessarily suspicious, when explained by decedent's condition and associates, in her life-time.

2. That contestant's theory, that the forgetfulness of the draughtsman of the will was simulated, in order to give a semblance of verity and genuineness to a forged instrument in his own handwriting, was not tenable, as such forgetfulness was rather calculated to endanger the case, while a ready statement of the facts of drawing and witnessing the will would have been the most obvious mode of averting suspicion.

3. That the case turned upon the conflict between these experts and the draughtsman, and that as he had lived for many years in a community where he was well known, and had served as a justice of the peace, and in other capacities, and testified positively to all the facts of execution, and was corroborated by a memorandum in his diary and another witness, and no attempt had been made to impeach his character, his testimony must control, and the instrument be admitted.

Conversations and dates, given from memory, are a kind of testimony which is apt to be unreliable, the conversations being often very imperfectly remembered, and the modes of expression misunderstood in their significance; and should not, alone, be regarded as controlling.

The testimony of a witness, to the actual signature of another in his presence, is not necessarily sufficient to overcome all evidence tending to a contrary conclusion, based upon the opinion of witnesses, familiar with the handwriting in question, as to its genuineness.

Testimony as to similarity of signature is much more persuasive and satisfactory than evidence of dissimilarity, it being the uniform experience that the signatures of a person often vary materially, owing to such causes as posture, nervous condition, freedom from interference, quality of material, and other circumstances.

The testimony of experts who are selected by the party in whose behalf their testimony is given, and whose testimony in his favor is assured beforehand, falls short of that impartiality which characterizes ordinary witnesses, and requires to be scrutinized with care.

Expert testimony as to handwriting is especially open to criticism, there being a lack of any standard, such as exists in the case of the medical or chemical expert, whereby to test the soundness of the opinions advanced.

It is improper to assume the criminality of a witness for the purpose of meeting coincident evidences of corruption, or of explaining apparent dissimilarity or contradiction.   The rule is to assume the honesty of the witness, until either his testimony is shown to be so inconsistent as to impair his veracity, or his general character for truth and honesty is successfully attacked.

APPLICATION for the probate of a will.

The will propounded bore date August 17, 1876, and purported to be witnessed by Peter Stephens and I. W. Canfield. After providing for the payment of debts, testatrix gave and devised all the residue of her property, both real and personal, of every kind and nature whatsoever, to her husband, Edward H. Hesdra, forever, and directed that he cause to be erected on her grave a decent and suitable tombstone, and keep the grounds of the plot in good order, and appointed her husband sole executor.

The probate was contested by Margaret Sarvent, decedent's sister; Ann C. Truax, a niece; Catherine A. Jeffrey, a niece; Mahalah C. Green, a sister; Dorcas J. Holmes, a niece; Mary J. King, a niece; W. H. G. Harley, a nephew; Hattie Washington, a grandniece; and A. W. G. Harley, committee, &c., of Augustus Harley, a nephew, a habitual drunkard; but no particular grounds of objection were stated.

Evidence was given to the effect that the testatrix, who was a married woman, living with her husband in New York, having no children, died February 9, 1879; that the will, though searched for by her husband, both at Nyack, where they sometimes staid, and at New York, was not found until about May 1, following, when he discovered it in a drawer of a bureau, at her residence, in a sealed envelope, among other papers, and took it to the office of his lawyer, Mr. McAdam.

The opposing parties examined thirty-eight witnesses, further particulars of whose testimony sufficiently appear in the opinion; except that of Abraham Eugene Hesdra, who testified, for proponent, that he was

a clerk for one Newcomb, a banker and broker; that he was not related to proponent; had been with him at Nyack in the spring of 1879, nearly every Sunday after decedent's death; had never brought away any papers in connection with proponent; thought it impossible for proponent to have packed up papers without witness's knowledge; and that he heard no such conversation as was testified to by Emma D. Edwards, that Mr. Hesdra was to be brought to court about a will, because he, Eugene, did not know how to make it.

QUENTIN McADAM, *for proponent.*

CURRAN & LINCOLN, *for contestant Green.*

WILLARD PECK, *for contestants Holmes and King.*

FIELD & DEYO, *for contestants Sarvent, Jeffrey and Truax.*

F. L. WESTBROOK *and* GEORGE W. WINGATE, *for contestants Harley.*

THE SURROGATE.—It is conceded that the testimony in this case sufficiently establishes the due execution of the will by the decedent, unless the proof warrants the conclusion that the signature of the decedent, and of the witness Canfield, are forgeries.

The circumstances which are alleged to militate against the genuineness of the instrument propounded are:

*First.* The long time which intervened between the death of the decedent, and the alleged finding of the instrument.

*Second.* The improbability of its being found, as stated by the proponent on the stand, after the examination of the papers by him in conjunction with Mr. Titus, and of Mrs. Truax; the former, however, stating that he aided in the examination of but one of the drawers, and

that they looked over but about a third of the papers in that drawer; while Mrs. Truax swears that, the day after decedent's burial, she and proponent looked over all the papers in all the bureau drawers; that she examined them then and the next day; and she states that she looked them over half a dozen times, and found nothing like the package in which the will was found.

*Third.* The numerous contradictions of the proponent, in respect to where he found the instrument, and the circumstances attending it; that, as Mrs. Truax testifies, he brought some papers down from Nyack on the Monday before May 1st, and told her that he had found the will which gave all to him in a broche shawl; the fact, however, as he testifies, being that he took the papers down to Mr. McAdam on the first day of May (it appears that they were taken the day before, as the will was opened at the Surrogate's office on the first of May); that he told Mr. Garnett, on Monday, after he had been to Nyack, that he had found a will tied up among papers which had been previously looked over—he couldn't say where he found it, but he then stated that the will gave all to him; while the proponent's testimony is that he knew nothing of the contents of the will until after it had been opened, after being found by Mr. McAdam at his office, on the last day of April; that he told Mrs. Jeffrey that he looked over all his papers at the house, then went to Nyack to search; and Mr. Garnett also testified that proponent told him that he found the instrument in a cloth among some papers, and told Mrs. Jeffrey that Eugene Hesdra had found the will in a drawer, and Mr. Truax that he found it in an old bandbox at Nyack, and that on one occasion he told him,

showing decedent's signature in a book, that it was her signature, and that the world couldn't counterfeit it; that he said to Mrs. Edwards, in the presence of Eugene Hesdra, that they were going to have him down to court about the will, because the young man (pointing to Eugene) didn't just know how to make a will; and witness testified that this remark was made laughingly.

*Fourth.* That Mr. Hesdra, after asking Mr. Titus to aid him in searching for a will the second time, put the papers away after he had gotten them out, and made a proposition to him to draw a will, saying it would be worth $2,000 to him, and he could occupy his house free of rent, and act as his agent, etc.

*Fifth.* That Mr. Stephens, the surviving subscribing witness, failed to remember the fact of the drawing, execution, and witnessing of the will in question, and failed to recognize his handwriting, when it was exhibited to him at first, in the body of the will.

*Sixth.* That, by several witnesses, it is shown that the signature propounded is not the genuine signature of the decedent, and that the name of the subscribing witness, Canfield, is also a forgery.

*Seventh.* That the entire instrument, including the signatures, was written by Mr. Stephens, as evidenced by the similarity of the writing, and that the signature Cynthia Hesdra, to the instrument, appears to have been executed after the paper had been folded and creased, while that of Mr. Stephens, written across the same crease, apparently, must have been written before the crease was made, and that those facts were evidence of the falsity of the signatures. That the signature of Canfield was simulated, and that of Cynthia Hesdra traced.

The delay in the production of the will, under proponent's explanation, does not seem to me to excite suspicion, when the condition of decedent, in life, and her associates are taken into account. As to the thoroughness of Mrs. Truax's examination of decedent's papers, the testimony of proponent and hers is contradictory ; and as she exhibits considerable feeling, and is an heir contesting, her testimony, like Mr. Hesdra's, should be scrutinized with reference to their interest in the result.

The inconsistencies in the statement of Mr. Hesdra, in respect to the manner and circumstances of finding the instrument, naturally excite suspicion, and yet those inconsistencies are sworn to by persons interested in the contest, with the exception of the Reverend Mr. Garnett, and are contradicted by Mr. Hesdra.

The theory of the contestants is that it was a part of a corrupt device to produce this will, to have it found among the papers of decedent carried to Mr. McAdam, a gentleman of high repute in the profession, and he to discover it in order to give character and verity to the proceedings. Now, if there was any such device, it is hardly conceivable that Mr. Hesdra was kept in ignorance of the scheme, while he was to act a part in conveying the papers to Mr. McAdam, especially as it must be assumed that whatever was done in the premises must have been done at his instigation, as well as for his benefit, for it is inconceivable that Mr. Stephens should have devised any such scheme without being instigated thereto, and largely rewarded by Mr. Hesdra therefor ; and yet it is claimed that, while the instrument appeared to be securely sealed up, and before it had been carried to the office of Mr. McAdam, the fact of its discovery

and its provisions were voluntarily and suggestively disclosed by Mr. Hesdra to several persons, who were especially interested in denying the existence of any such instrument.

The testimony of Mr. McAdam shows that the papers of decedent, which were taken to his office, were taken there under his direction, and it clearly appears that the instrument in question was carried by Mr. Hesdra to the office among other papers on the last day of April, 1879, which was Wednesday, and that in the after part of that day he examined them and found the instrument in question, which he did not open, and then wrote to Mr. Hesdra, who called the next day, Thursday, May 1st, to whom he exhibited the package, including the closed envelope, unopened, and that by arrangement, before it was opened, they went to the Surrogate's office, where it was opened by the probate clerk in the presence of the respective parties.

Where conversations or dates are given by witnesses, it is a kind of testimony which is liable to be unreliable, being stated from memory, which is so often at fault ; and it is a very common experience of those dealing with human testimony that conversations are very imperfectly remembered, and that modes of expression are often misunderstood in their significance ; and while such conversations as are charged upon the proponent in this case, with other suspicious circumstances, should be considered, alone they ought not to be regarded as controlling.

The testimony of Mr. Titus respecting the proposition to draw a will, which is contradicted by Mr. Hesdra, is a circumstance which might be well considered as show-

ing the fraudulent disposition of Mr. Hesdra, and his desire to obtain the property belonging to his wife, even at the risk of procuring a forged instrument; and if true greatly impairs the value of the testimony given by him in this case, if it does not discredit it.

It is claimed by contestant's counsel, as I understand his argument, that Mr. Stephens' forgetfulness of the instrument and the handwriting of the body of the will is a mere pretext, for the purpose of giving a semblance of verity and genuineness to a false and forged instrument, executed by himself subsequent to the death of decedent, and after diligent search had revealed that she had left no will; but it would seem that such a forgetfulness would throw suspicion upon the transaction, and endanger the case, as he must have known that the numerous persons, who were doubtless familiar with his handwriting, would afford an easy mode of proof that the body of the will was in his handwriting; and if he had, under the inspiration of Mr. Hesdra, forged this instrument, it would seem that his prompt and ready statement that he drew the instrument, and acted as one of the witnesses, and that Mr. Canfield was the other, and that it was drawn under the instructions of the decedent, at her request, would have been the most obvious mode of averting suspicion from the transaction, while his expression of ignorance as to the handwriting of the body would seem to have been a circumstance well calculated to provoke inquiry.

The testimony, which is claimed by the proponent to sustain the genuineness of the instrument propounded, is, in substance: *first*, that of Mr. Hesdra, that he found the same among the papers of the decedent, after dili-

gent search ; *second*, that of Mr. Stephens, one of the subscribing witnesses, who testifies to the fact that his recollection has been so refreshed that he recalls the circumstance, that on the day prior to the execution thereof he met decedent at Nyack—where she was accustomed to visit, and live part of the year—with two children in her company, whom she directed to pass on ; and she requested him to draw her will, and stated that she desired to give everything to her husband, and to provide for the erection of a tombstone over her remains, and keeping of the burial-plot in order; and that she had agreed with her husband to give him all her property, and he was to give her all his ; and that accordingly he made an appointment for her to meet him at his office the next day, at one o'clock, and that in pursuance of that appointment he made an entry in his diary, under date of the 17th, next day, to meet decedent at the office, "to witness paper—get another witness ;" but he testifies that he has no independent recollection of the execution of the instrument the next day, but relies upon the fact that his signature as a witness is subscribed, and to his uniform custom in the execution of such instruments ; and that his attention had been called to the subject by Mr. Dorfner, a constable, residing at Piermont, who informed him that, about the time the instrument bears date, he was at Nyack—saw Mr. Stephens, whom he met on the street, and Mrs. Hesdra, and Mr. Canfield—that they three then proceeded to the office of Mr. Stephens, and that, after waiting a while, he went up-stairs to the office, and there saw them together— Mr. Stephens was apparently writing, sitting behind a desk, and he was told by him that he was engaged—that

he·then went out of the office—that he recollected Mr.
Stephens' stating, before he had met decedent and Mr.
Canfield, that he had a sheriff's jury to swear in at one
o'clock, which conforms to the memorandum in his,
Stephens', diary of that date. Mr. Dorfner testifies, in
substance, to the occurrences as stated, though, as to
some minor points, they differ in the details of the cir-
cumstances.

This testimony is corroborated by several witnesses,
who testify to their familiarity with the signatures of
Mrs. Hesdra and Mr. Canfield, which are disputed—
that they are the genuine signatures of the decedent
and of Mr. Canfield, who is now deceased; and so far as
the testimony of witnesses familiar with the signatures
of decedent and of Mr. Canfield is concerned, the evi-
dence of their genuineness preponderates over that
against such genuineness; while two experts called by
the contestant, claiming to be such, and able to determine
whether a signature is simulated, traced or genuine, have
been examined and cross-examined fully upon the sub-
ject, and they both express the opinion that the signature
of Mr. Canfield, as a witness to the will, is simulated or
forged, and that that of the decedent was traced over the
genuine signature, and that from a careful analysis of
those signatures, and the body of the instrument, they
are of the opinion that they were all written by the
same hand, and that they correspond with the genuine
signature of the witness Stephens, so as to show, in their
opinion, that he wrote the entire instrument.

The two experts have given in detail the reasons
why they entertain 'the opinion, that the same hand
which wrote the body of the instrument wrote the name

of Canfield, and of the decedent, to the will, by point-ing out what they claim to be similar letters, pen press-ure, slope, curves, and general characteristics, but which, so far as I am able to observe, from the most careful examination, falls short of satisfying me, that upon such a comparison it would be safe to conclude that the same hand wrote them, unless great weight is given to the opinion of those experts, which does not appear to be sufficiently corroborated by the illustra-tions, which they furnish as the basis of that opinion.

The expert Southworth testified that, in his opinion, the name of the decedent, to the instrument propounded, was traced over a genuine signature, while the expert Cresson is of the opinion that only the "Cy" of the decedent's first name was traced, and the balance simu-lated, but yet they both point out numerous alleged simi-larities found in the signature of the decedent with sim-ilar letters in the body of the will; which seems to me to be a contradiction, provided the testimony of Mr. South-worth be true, that the signature was traced; for, if traced, then it is clear that the size and style of the letters in the signature, the space between the letters, curves, and loops, would all concur with the genuine writing of the decedent, since the tracing of a signature, if it be even indifferently done, would have the charac-teristics of the real signature, and not by any means those of the person who traced them, as the object of tracing is to catch all those peculiarities and character-istics of the handwriting.

It is also worthy of especial note in this connection, that the expert, Cresson, particularly states that the only characteristics of the genuine signature, given in

evidence, of Cynthia Hesdra, which enables him to distinguish them from that of the will, are the letters "s," "r," and "d," in Hesdra ; he states, when his attention was particularly called to the subject, that the "r" in Hesdra is of the same kind of letter as that in the same name in the body of the will ; while an examination of the letter in those several names shows to the unpracticed eye an entirely different style of "r" from those in the body of the will.

Counsel for the contestant have indulged, by way of argument, in a theory of Mr. Stephens' criminality, which harmonizes with the appearance of the paper, the motive of Mr. Stephens in failing to recognize the body of the will as his handwriting, his failure to remember the circumstance of the will being drawn and witnessed by him, and what the experts think is evidence, that Mr. Stephens' signature was made after that of Canfield, and before that of decedent to the will ; but it is a question of very serious consideration, whether counsel have a right to assume the criminality of a witness for the purpose of meeting what he is pleased to call coincident evidences of corruption, and as a means of explaining apparent dissimilarity or contradiction ; indeed, I think that the true rule is always to assume the honesty of a witness until his testimony is either shown to be so inconsistent as to impair its veracity, or until his general character for truth and honesty shall be successfully attacked.

I cannot concur with the counsel for the proponent, in the opinion, that the fact that Mr. Stephens testifies to the actual signature of Mr. Canfield and of the decedent, is sufficient to overcome all evidence tending to a con-

trary conclusion, based upon the opinion of witnesses familiar with the handwriting, as to their genuineness ; for if such a principle should prevail, the proof by a living witness of the signature of a decedent, claimed to have been made in the presence of the witness only, would place the matter beyond the reach of contradiction or discredit, and foreclose all possible inquiry upon the subject. But I fully concur in the authorities cited by the counsel, that the force to be given to the testimony of similarity of signature is much more persuasive and satisfactory than that resulting from evidence of dissimilarity ; for it is the experience of all business men that persons often vary materially in their signatures, depending sometimes upon the character of the pen, quality of paper or ink, and nervous condition of the writer, his posture in writing, his absence from other interference, and many other circumstances which might be suggested, all of which serve to occasion dissimilarity (Young *v.* Brown, 1 *Hagg.*, 556 ; Constable *v.* Steibel, 1 *Id.*, 56 ; Bell *v.* Norwood, 7 *La.*, 95 ; Murphy *v.* Hagerman, 1 *Wright* [*Ohio*], 293).

I am of the opinion that, upon the evidence, aside from the opinion of the two expert witnesses in handwriting, I should have no difficulty in reaching the conclusion that the allegations of falsity of the signatures of the decedent and of the witness Canfield have not been satisfactorily sustained, and therefore I am brought to the inquiry whether those opinions are sufficient to overcome the positive testimony of Mr. Stephens, corroborated, as it is, by the memorandum made by him in his diary, and by the testimony of Mr. Dorfner, above referred to.

Considerable experience has taught me that the testimony of experts who are selected by the party in whose behalf their testimony is to be given, and whose testimony in his favor is assured beforehand, is likely to be considerably influenced by the fact that the experts have been employed as such by the party calling them, and that while on the stand they are paid to have a theory, which they are zealous to maintain ; and as a general rule they fall short of that impartiality which characterizes ordinary witnesses in court ; and this observation has led me to scrutinize, with great care, the testimony given under such circumstances, and for this I have the warrant of one of the most accomplished jurists of this country (1 *Redfield on Wills*, 155 ; Winans *v.* N. Y. & Erie R. R., 21 *How. U. S.*, 101).

If the testimony of experts in general is to be so regarded, it seems to me, notwithstanding the argument of the learned counsel for the contestant in this case, that expert testimony as to handwriting, as applied to this case, is especially open to criticism. The opinion of a medical expert may be tested by the standard authorities of medicine ; the chemical expert may be required to make his experiment upon which he bases his conclusions before the court ; and there is some standard by which to test, not only the capacity of the expert, but the soundness of his opinion. What is there to test the soundness of the expert's opinion in this case, that the handwriting of the body of the will propounded is the same as that of the signatures of Canfield, Hesdra, and Stephens, without the means of testing the theory of those experts, that the signature of Mr. Canfield to the will was simulated by long trial of the writer,

and that that of the decedent was traced over a genuine signature of the decedent? It seems to me that, in such a case, parties are substantially at the mercy of experts, if their testimony and theories are to be recognized as evidence, upon which the positive testimony of the person who made his own signature and saw the others made, is to be overcome; especially where, as in this case, the witness who claims to have seen its execution by the decedent, and the witnessing by Mr. Canfield, both on direct and cross-examination demeaned himself before the court so as to excite no suspicion as to his intelligence, his impartiality, or his integrity, though he knew that the whole contest was predicated upon a very serious criminal imputation upon his conduct; and this last suggestion seems to me, to be substantially conclusive of this case. Mr. Stephens had lived for many years in a community where he had served as a justice of the peace, and been engaged in other occupations, and was well known to a large community; and if there was anything in his character for truth or honesty to excite suspicion or doubt, it would have been known to his neighbors and business acquaintance, and if any just suspicion had existed, the diligence and persistency with which this contest has been waged is an assurance that it would have been discovered and disclosed on the hearing of this case; and it is therefore entirely legitimate to assume that Mr. Stephens is a man of good repute and character among those who knew him. That fact being assumed, it is not reasonable to suppose that such a man entered upon the commission of so great a crime as is imputed to him by this contest, without the slightest motive, so far as the evidence in this case shows.

SARVENT *v.* HESDRA.

But for the strangely contradictory statements of the proponent, as to the place where the instrument propounded was found by him, and of his knowledge of its contents, I should have had no hesitancy in admitting this will to probate : but while those contradictions, if they have been correctly recalled and related by the several witnesses who have testified, may well impugn the veracity of the proponent, they do not in any way affect the positive testimony of Mr. Stephens, as to its execution.

The decedent and proponent lived as husband and wife for many years, without any evidence of alienation or discord, and the decedent left no children or parents to whom she owed any duty in the way of testamentary provision, and her husband was naturally entitled to her kindly remembrance in the disposition of her estate ; and it is no violent presumption,—considering that the decedent was a business woman, had had charge of a considerable estate, had made and received conveyances, and engaged in some litigation, understood the effect of dying intestate, and that her property, being in real estate, would none of it go to her husband, but would descend to her collateral relatives ; and the proponent in his testimony gave, as a reason why he made diligent search for a will, that there was an understanding between decedent and himself upon the subject, corroborating, so far, the testimony of Mr. Stephens when the instructions were received ; and he also stated that he was informed, by a person whose name he gave, that she knew that there was a will left by decedent, who could have contradicted him in that respect if the story was untrue.  The instrument should be admitted.

Decreed accordingly.